UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBY THREET,

    Plaintiff,     Case No. 04-74323

vs.

            HONORABLE NANCY G. EDMUNDS
JO ANNE B. BARNHART,    HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY, MAGISTRATE JUDGE

    Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.**  **BACKGROUND**

Bobby Threet brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be GRANTED and Defendant's motion for summary judgment be DENIED, and this matter be remanded for further proceedings.

  **A.**  **Procedural History**

Plaintiff originally filed an application for DIB on May 6, 2002, claiming disability since January 31, 2002, (R. 40) due to Graves disease, colitis, depression, migraine, bleeding and back pain (R. 50). This claim was denied on June 18, 2004, after a May 19, 2004, hearing by Administrative Law Judge (ALJ) Anthony B. Roshak (R. 13-22). The Appeals Council declined review (R. 5-7). Plaintiff's date last insured is December 31, 2007 (R. 20).

**B.**   **Background Facts**

1.   ***Plaintiff's Testimony***

Plaintiff was fifty years old, 6 feet tall and weighed 330 pounds at the time of the hearing (R. 166).  He was married and had 2 children, ages 18 and 22 (R. 167).  He graduated from high school and received no further vocational or special training.

He wakes up around 7:30 or 8:00 a.m. each day.  He spends most of the day watching television and tries to "help around the house" but says he is limited.  He goes to bed at 10:00 p.m. He helps with housework only "once in a great while", does not attend church and watches television approximately four hours per day (R. 167-68).  He does not visit with friends and relatives very often, or go to the movies (R. 168).[1]  He is not involved in sporting activities or hobbies.  He does not do yard work, but does occasionally go grocery shopping for a "few items" by himself, though he cannot push or pull a grocery cart (R. 168-69).  His wife must do the majority of the grocery shopping with his daughters' assistance (R. 169).  He can drive a car, but cannot sit in the car long periods of time (R. 173-74).

He does not smoke, drink alcohol or take illegal drugs (R. 169-70).  Severe joint pain prevents him from climbing stairs (R. 170).  He can take of personal needs and dressing (R. 170). He can sit for 45 minutes - 1 hour before he feels he has to get up and "move around a little bit". He can stand for 15 minutes (R. 170, 73).  He can walk for 150 feet before his back begins to hurt and his "leg goes numb" (R. 171).[2]  He can manipulate his arms and fingers, pick up coins from a

---

[1]Plaintiff did indicate in his disability application that he visited his mother once a week for about thirty minutes (R. 69-70).

[2]In his *Pain Questionnaire* Plaintiff indicated he could walk 1-2 blocks before pain prevented him from going further (R. 72).

table, button buttons and lift 10-20 pounds (*id.,* see also R. 179, R. 73).  He has trouble bending, pushing and pulling (R. 171-72).

He does not have trouble understanding, but sometimes has trouble remembering, detailed instructions (R. 172).  He has trouble maintaining attention and concentrating.  He wears corrective eyewear for a vision impairment (though he does not wear them for reading) and has trouble with his hearing, but does not wear a hearing aid.

He has "trouble" with dust, fumes and/or chemicals.  He has trouble reaching for items and handling or grasping items (R. 173).  He has trouble stooping over, kneeling, climbing, crawling, crouching or squatting.

When he was working he had trouble getting along with his supervisors, but not his coworkers.  He is depressed (R. 176).  He has been seen by two psychiatrists for his depression in the past, but these doctors have since passed away and he is now being treated for depression through his primary care physician, Dr. Omell.  When completing the *Self-Rated Global Assessment Scale*, Plaintiff rated himself 31-40, which indicates that he believes his problems severely affect his life (R. 85).  The form gave the following as examples of behavior in this category:  "avoid interactions with others by staying at home, easily angered by others, has attempted suicide once or other people think that you don't make sense" (R. 85).

Plaintiff is unsure but believes his medication causes him to have headaches and rectal bleeding (R. 177).

His past employment included machine operating, shipping, storeroom and stock clerk positions (R. 174).  He last worked on January 31, 2002, and stopped when the plant closed down due to bankruptcy.  He has not attempted to work since that time.  He receives a pension of

$1,237/month (net) from his previous employment (R. 175).  He would like to return to work but is prevented from doing so by "joints and my pain and my back problems and, I guess, my carpal tunnel".  He has carpel tunnel in both wrists (R. 176).  His former employer reopened six months after the initial closure, but he could not attempt to return because "they require a lot of standing and stuff, and there's no way I can do it anymore".  He was actually having difficulty working before the plant closed down, but a co-worker helped him complete his job duties so that he could work long enough to secure insurance and severance pay (R. 180).

### 2.    *Information Provided by Wife*

Plaintiff's wife completed the *Daily Activities Form* wherein she described her observations regarding Plaintiff's condition (R. 74-79).  She indicated that he got up each day around 7:30 a.m. and "does as much as he can when he's not in pain" (R. 74).  He tries to walk the dog as much as he can and complete minor tasks around the house.

Because of the sitting and standing involved he can no longer attend sporting events as he used to, and he no longer bowls three nights per week.  He can not read as much as he used to because of vision problems.  For the most part he gets along with other people, but has a short fuse and often leaves the room to be by himself (R. 75).  He has a lot of friends and these friends are aware when they should "not come around or when to leave him alone" and his extended family "understands about his explosive moods".  He used to be involved in group activities and now "stays to himself," "he hardly does anything" "he is totally different".

He drives only when he really needs to because of poor vision (R. 76).  He tries to clean the house, but has a hard time bending, lifting and picking things up.  He is unable to do yard work, shop fix things or participate in clubs.  He does take care of his personal needs.  He sleeps 6-8 hours

4

per night with "broken sleep" (R. 77).

He needs assistance with household chores, cooking and hires out the yard work (R. 78). He gained 100 pounds since being diagnosed with Graves disease (R. 79).

### 3.     **Medical Evidence**

September 13, 1994, electromyography and nerve conduction studies indicated the presence of carpel tunnel syndrome which was severe on the right side and moderate on the left side. This was noted to be a clear progression from the previous EMG study done February 1, 1994 (R, 117-118).

March 31, 1995, electromyography and nerve conduction studies indicated the presence of bilateral carpal tunnel syndrome of moderate severity on the right side and mild on the left side, with significant improvement from the September 1994 study (R. 115-116).

In June 2000 Plaintiff visited Larry A. Adler, M.D., with complaints of loose stools, urgency and hematochezia (R. 127). He stated that he had up to 3 bowel movements a day and nocturnal episodes. He denied significant abdominal pain, nausea or vomiting, fever, chills or sweats. He denied joint pain, but stated that he had a chronic rash on his abdomen. Biopsies confirmed the presence of chronic inflammatory bowel disease. Dr. Adler diagnosed Plaintiff with ulcerative colitis, with an onset six weeks earlier (R. 127-28). Dr. Adler prescribed Asacol and explained that he would need a colonoscopy to stage the disease (R. 128).

An August 15, 2000, colonoscopy revealed minimal crypt distortion and no active inflammation, with no dysplasia in any of the biopsies (R. 124). Dr. Adler described Plaintiff as "asymptomatic on Asacol therapy" and suggested that he continue on maintenance therapy and make an appointment to be seen for follow-up in three months (R. 126). August 18, 2000, bloodwork

5

revealed all tests within normal limits (R. 123).

On November 7, 2000, Dr. Adler confirmed that Plaintiff's colitis was under control with medication (R. 122). Plaintiff was informed that he might experience occasional flare-ups of his symptoms.

On January 11, 2002, Plaintiff complained that he was experiencing episodes of diarrhea three times/week with multiple loose stools each day and rare episodes of abdominal cramping and fecal incontinence/soiling (R. 121). Plaintiff also reported that there was a scant amount of blood in his stool. Dr. Adler's impression was that Plaintiff ulcerative colitis was "currently mildly active," and recommended that he use Imodium each day, call in a week to report on his symptoms and have a follow-up exam in 3-4 weeks. Dr. Adler hypothesized that Plaintiff's decreased sphincter tone could have been caused by his thyroid condition, and that his incontinence was a combination of the decreased sphincter tone and loose stools.

January 21, 2002, bloodwork reveals tests within normal limits except HDL cholesterol (which was slightly low), total/HDL cholesterol (which was slightly high) and TSH (which was low) (R. 130).

On July 22, 2002, Richard B. Omel, D.O., Plaintiff's general practitioner, opined that Plaintiff should avoid repetitive bending and lifting more than 25 pounds, due to the following conditions: hypothyroidism, hypertension, ulcerative colitis, obesity and bulging intervertebral disc at L5-S1 (R. 129).

In September 2002, Dr. Omel completed a form which appears to have been submitted to him by the State of Michigan disability service, in which he described Plaintiff as unable to sit or stand for any length of time and unable to lift more than 15 pounds (R. 131). Dr. Omel explained that

6

Plaintiff was diagnosed with hypothyroidism, hypertension, arthritis related to ulcerative colitis, anxiety with depression, gastritis with positive H.Pylori-treated, carpal tunnel syndrome and left sided S1 radiculopathy.

On October 17, 2002, Mary C. Wood, M.D., examined Plaintiff (R. 133-41).  Plaintiff reported that his ulcerative colitis was controlled well with Asacol, though he has rectal bleeding reoccurred once in a while and he used Imodium to control diarrhea as needed (R. 133).  Plaintiff complained of arthritis in his knees, wrists, shoulders and ankles, which was worse in the right shoulder, right ankle and left knee.  Plaintiff explained that his back pain had lasted ten years and that his left leg went numb sometimes.  Plaintiff reported difficulty standing, sitting, lifting, walking and climbing.  Plaintiff also stated that he had been depressed all his life and that he had a couple of nervous breakdowns and did not like to go into public (R. 134).  Dr. Wood noted that Plaintiff was obese (R. 135) and diagnosed him with Graves disease, ulcerative colitis, osteoarthritis, carpal tunnel syndrome, anxiety and depression, and labile hypertension (R. 137).[3]

On November 9, 2002, Robert H. Digby, M.D, completed the *Physical Residual Functional Capacity Assessment* and found that Plaintiff had the RFC to occasionally lift/carry 10 pounds, frequently lift/carry less than 10 pounds, stand or walk at least 2 hours and sit about 6 hours in an 8-hour work day, and limited pushing and pulling with upper extremities (R. 89-90), with further limitations for only occasional climbing, balancing, stooping, kneeling, crouching, and crawling (R. 91) and frequent but not constant handling (gross manipulation) (R. 92), and limited concentrated

---

[3]Dr. Wood noted that Plaintiff's external shoulder rotation was only 45 degrees on both sides (normal limit is 90 degrees)(R. 138) and Plaintiff's knee flexion was 130 degrees on the right and 100 degrees on the left (normal limit is 150 degrees) (R. 139).

exposure to hand vibration (R. 93).

Psychiatrist Sung-Ran Cho, M.D., examined Plaintiff on November 13, 2002, at which time Plaintiff described a lifelong history of depression (R. 142-46). Plaintiff recounted an inability to get along with his coworkers and his supervisors in his past employment (R. 143). Dr. Cho described Plaintiff as argumentative and defensive (R. 144). He explained that Plaintiff was cooperative but guarded and vague with information. Plaintiff was in good contact with reality. Plaintiff spoke in a loud angry voice with a moderate amount of spontaneity and productivity, though his conversation was coherent and relevant. Plaintiff explained that he had been depressed since his early 20's. Plaintiff also described two nervous breakdowns, one 20 years ago and one 14 months ago. These episodes were accompanied with feelings that his skin was crawling, pins and needles and that things were not normal - Plaintiff could not give more details. Plaintiff denied homicidal or suicidal ideas. Dr. Cho diagnosed dysthymic disorder and a personality disorder, gave Plaintiff a GAF of 55, and a prognosis of fair for functioning (R. 146).[4]

On December 4, 2002, Valore J. Domino, M.D., completed the *Psychiatric Review Technique* form, indicating that an RFC assessment was necessary because Plaintiff had an Affective Disorder and Personality Disorder (R. 97). She described the affective disorder as dysthmic disorder (R. 100). Plaintiff was described as having no restrictions in daily living, and moderate difficulties in maintaining social functioning, concentration, persistence or pace (R. 107). Dr. Domino also completed the *Mental Residual Functional Capacity Assessment* indicating that Plaintiff was

---

[4]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration or extended periods, interact appropriately with the general public and respond appropriately to changes in work setting (R. 111-112). Plaintiff's resulting Functional Capacity Assessment was for unskilled simple work, 40 hours/week, without intense general public interaction, with changes in work done "in step by step fashion" (R. 113).          On January 15, 2004, Plaintiff was seen following a recent call regarding a reoccurrence of blood in his stool (R. 147). Dr. Adler had increased Plaintiff's medication over the phone based on Plaintiff's description of the problem, and now diagnosed a mild flare of distal ulcerative colitis which was brought under control with the increase in his medication. Plaintiff's medication was reduced and Plaintiff was told to call back should a flare up occur again.

A February 16, 2004, Magnetic Resonance Imaging test (MRI) revealed a mild diffuse bulge of the L4-5 and L5-S1 discs, causing some mild effacement of the thecal sac at L4-5 but no significant effacement on the thecal sac at L5-S1, and the neural foramina were normally patent (R. 148).

On February 26, 2004, Albert Belfie, D.O., performed electromyographic testing on Plaintiff's upper extremities, lower extremities, neck and back (R. 149-54). Dr. Belfie reported bilateral carpal tunnel syndrome slightly worse on the right, but no neuropathy, radiculopathy, myopathy or plexopathy in the nerves and muscles tested (R. 154).

On April 23, 2004, Dr. Omel opined that Plaintiff could sit for 4 out of 8 hours, stand and walk for 2 out of 8 hours, occasionally lift and carry 10 pounds, and occasionally kneel, crouch, stoop and balance, but never climb or crawl (R. 155-57). Dr. Omel also indicated that Plaintiff had environmental restrictions regarding heights, fumes, vibration and moving machinery (R. 157).

### 3.   *Vocational Evidence*

Dr. Elaine Tripi served as the vocational expert (the "VE") in this matter (R. 181).  VE Tripi testified that Plaintiff's last employment, stock and inventory clerk, involved medium exertion and was considered semiskilled (R. 183).  Plaintiff did not have any skills transferrable to sedentary work and, at most, was qualified for light operative jobs.  Specifically, his skills would transfer to forklift and tow truck driving positions at the light level with no lifting, of which there were 2,500 positions in the Detroit area (R. 184).

The first hypothetical posed to the VE by the ALJ described a person of Plaintiff's age, education and the "exertional limitations that [Plaintiff] testified to and are included in the record –that is his limited ability to sit, stand, walk, lift, carry, push or pull" (R. 184).  ALJ Roshak asked whether, under this hypothetical, Plaintiff could perform any of his past work or any other work.

VE Tripi responded that Plaintiff could not return to his past work, but could do sedentary work activity with a sit/stand option involving simple tasks such as 7,500 sorting, packaging, visual inspection, assembly positions that were available in Detroit.

ALJ Roshak responded "Any light work," to which VE Tripi added, "[A]t the light level unskilled area, similar types of jobs.  The numbers would be 30,000 in the Detroit area".

ALJ Roshak then posited the following question, "If we further his non-exertional limitations, physical, mental, postural, manipulative, visual, environmental and functional limitations, any work he can do?".  To which VE Tripi answered negatively, giving as her reason Plaintiff's "perception of severe pain in the various parts of his body ... as well as difficulty with attention and concentration" (R. 185).

VE Tripi explained that her testimony was not in conflict with the DOT, with the exception

10

that the DOT is silent with regard to the sit/stand option.

### 5. *The ALJ's Decision*

ALJ Roshak found that Plaintiff met the disability insured requirements of the Act on his alleged onset date, through December 31, 2007, (R. 20) and that he had not engaged in substantial gainful activity since January 31, 2002. Plaintiff was 50 years old and had a high school education (R. 21).

Plaintiff had Graves disease, ulcerative colitis, obesity, hypertension, osteoarthritis of the lumber spine with chronic back pain, bilateral carpal tunnel syndrome, depression and anxiety. The severity of the Plaintiff's conditions considered individually or in combination did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4 (the "Listing") (R. 21).

Plaintiff's subjective complaints and allegations of debility were exaggerated, self-serving and without objective probative medical or non-medical support.

He had the residual functional capacity ("RFC") to perform light work (R. 18) with a sit/stand option and a limitation for work involving lifting/carrying more than 20 pounds or more than unskilled tasks (R. 20).

Plaintiff is unable to perform his past work as a machine operator, shipping clerk, stock clerk, or forklift operator. Transferability of skills was not an issue due to Plaintiff's age and RFC.

Using the Medical-Vocational Guidelines as a framework, together with the testimony of the VE, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy referring to the limited number of light jobs identified by the VE, and Plaintiff was, therefore, not disabled.

## II.    ANALYSIS

### A.    Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

---

[5] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

**B.**   **Factual Analysis**

Plaintiff challenges the Commissioner's decision on several grounds, which are summarized as follows:  (1) Plaintiff's obesity was not properly taken into consideration, (2) the weight given to Plaintiff's treating physician and the State agency consultants was inadequately explained and improperly discounted, (3) Plaintiff's credibility was improperly impugned and (4) the hypothetical questions posed to VE Tripi were improper.

### 1.   *Obesity Consideration*

ALJ Roshak found Plaintiff to be obese (R. 17).  Plaintiff argues that ALJ Roshak failed to fully take his obesity into consideration when determining his RFC.  SSR-02-1p explains how obesity is evaluated in assessing RFC:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. *Obesity may also affect an individual's social functioning.*

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a

13

day, for 5 days a week, or an equivalent work schedule.  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

*The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.*

SSR 02-1p (emphasis added).

In his decision ALJ Roshak only appears to have considered whether Plaintiff's obesity manifested in a mechanical limitation, which he determined that it did not (R. 17).  He did not consider, at least he did not articulate a consideration regarding, whether the combined effects of obesity and Plaintiff's other impairments may be greater than might be expected without obesity.  For instance, could Plaintiff be expected to have more pain and limitation from the mild disc bulge at L4-5 and L5-S1, hypertension and osteoarthritis of the lumbar spine due to his obesity?

SSR 02-1p appears to contemplate such an assessment as part of the Commissioner's decision regarding RFC.[6]  Failure to further elaborate on the issue of obesity, does now warrant rejection of an ALJ's decision in a case such as this where Plaintiff and his treating physicians, and their medical records fail to suggest any functional limitations or increased pain symptoms resulting specifically from Plaintiff's obesity.  *See Essary v. Commissioner of Social Sec.*, 114 Fed. Appx. 662, 667 (6th Cir. 2004)(citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) ("rejecting claimant's 'argument that the ALJ erred in failing to consider his obesity in assessing his RFC,' explaining that, 'Although his treating doctors noted that [the claimant] was obese and should lose weight, none of

---

[6]This should also have been considered in assessing Plaintiff's credibility regarding his subjective complaints of pain and reduced capacity for social functioning, which will be discussed more fully below.

them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.'").

Plaintiff also takes issue with ALJ Roshak's statement regarding the lack of evidence to suggest that Plaintiff has an inability to lose weight. Though Plaintiff is correct that "a claimant's inability or refusal to lose weight does not, per se, preclude a finding of disability, see *Johnson v. Secretary of HHS*, 794 F.2d 1106, 1113 (6th Cir.1986), the ALJ could believe that claimant's refusal to lose weight despite the aggravation obesity caused his condition, indicated that perhaps his condition was not as painful as claimant alleged." *Walton v. Secretary of Health and Human Services,* 875 F.2d 869, 1989 WL 43915, *4 (6th Cir. 1989). Therefore, this statement is not without utility because Plaintiff's ability to lose weight could be taken into account in assessing his credibility regarding his subjective pain complaints.

### 2.   *Weight Given to Medical Experts*

#### *A. Treating Physician*

Plaintiff's argues that ALJ Roshak improperly discounted the opinion of his treating physician, Dr. Omel. In his decision ALJ Roshak explained that Dr. Omel's "medical assessment, if accurate, would preclude the performance of any substantial gainful activity" (R. 18). ALJ Roshak went on to determine that Dr. Omel's opinion was "not well-supported by medically accepted clinical or laboratory diagnostic techniques and, thus, such opinion cannot be given controlling weight in the evaluation of Claimant's" RFC .

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. Earlier case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's

15

opinion of disability was binding on the Social Security Administration as a matter of law.[7]   The

administrative decision could reject a properly supported treating physician's opinion of disability if

the record contains "substantial evidence to the contrary."  *Hardaway v. Sec. of HHS*, 823 F.2d 922,

927 (6th Cir. 1987).  Yet, this law has been slightly modified by administrative regulation which gives

the Commissioner broader discretion to reject certain treating physician opinions.

In August 1991, the Social Security Administration adopted a new regulation in response to

the treating physician rules adopted by the various circuits.  20 C.F.R. §404.1527 [SSI § 416.927].

While the regulation indicates that the Commissioner will generally give more weight to the opinions

of treating sources, it sets preconditions for doing so, which are more strict than those established by

the Sixth Circuit.  The 1991 regulation also limits the scope of the subject matters on which the

Commissioner will give a treating source opinion greater weight.

Under the 1991 regulation, the Commissioner will only be bound by a treating source opinion

when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI

§ 916.927(d)].

The regulation also limits the subjects upon which the Commissioner must defer to a treating

source opinion to "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. §

404.1527(d)(2), [SSI § 916.927(d)(2)].  Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the

Commissioner will not defer or provide special significance to treating source opinions on certain

---

[7]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and
diagnoses of treating physicians are generally accorded substantial deference, and if the opinions
are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)
(same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v.
Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work.  Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In 20 C.F.R. 404.1513(b) & (c) [SSI § 416.913 (b) & (c)] and SSR 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity" (RFC).  The former is a physician's opinion on either physical or psychological capacities for work related activities.  When based on the medical source's records, clinical and laboratory findings, and examinations it can be considered a "medical opinion" under §404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion."  Yet, because these medical opinions are different from the formal findings under §404.1527(e)  [SSI § 416.913(e)]  on "disability" and on "residual functional capacity" -- which are subjects reserved to the Commissioner and which may be based on additional evidence in the record  -- the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §404.1527(d)(2) [§416.927(d)(2)], i.e. the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."

17

Dr. Omel in April 2004 opined that Plaintiff could do the following in an 8 hour work day: sit 4 hours; stand 2 hours; lift up to 10 pounds; occasionally kneel, crouch, stoop and balance; never crawl or climb; and refrain from exposure to heights, fumes, vibration and moving machinery (R. 156-57).[8] These are matters of medical opinion regarding what Plaintiff can still do despite his impairment because they are based upon Dr. Omel's records, findings, and examinations. Whether and the extent to which ALJ Roshak was bound by these opinions depends on the extent the limitations are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record.

It is unclear what ALJ Roshak meant when he discounted Dr. Omel's findings upon a conclusion with the summary statement that they were "not well supported by medically acceptable clinical or laboratory diagnostic techniques and, thus, such opinion cannot be given controlling weight." As noted later, ALJ Roshak seems to use lack of objective evidence to reject whatever is inconsistent with his conclusion.

Dr. Omel has been treating Plaintiff since at least 1994 and during that time has received electromyography studies confirming a diagnosis of carpel tunnel syndrome (R. 115-20, 149), a colonoscopy confirming a diagnosis of ulcerative colitis (R. 124-26), and an MRI confirming L4-5 and L5-S1 disc bulges (R. 148). These are acceptable clinical or laboratory diagnostic techniques. Yet, on the critical issues of lifting sitting and standing capacity only the MRI is significant, and MRI data does not indicate weight and sit/stand limitations, but only underlying conditions that would reasonably limit these capacities. While this may be sufficient reason for the ALJ not to be bound

---

[8] Dr. Omel in July 22, 2002, believed that Plaintiff should avoid repetitive lifting of more than 25 pounds. (R. 129).

by Dr. Omel's opinion, it is not sufficient reason not to consider it as some evidence along with other evidence as the Commissioner's regulations require.  In those situations where the Commissioner does not give the treating source opinion "controlling weight," the regulations set out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record.[9]  Further, even when not given controlling weight SSR 96-2p explains that "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  It is not clear from the decision in this matter that ALJ Roshak considered Dr. Omel's opinion at all after deciding that it did not have controlling weight.

In addition, Dr. Omel's findings are not contradicted by other substantial evidence in the record.  In fact, ALJ Roshak did not assert that they were.  Even the state agency consultant's opinion was generally in line with Dr. Omel's diagnosis.

Dr. Digby gave Plaintiff the RFC to occasionally lift/carry 10 pounds, frequently lift/carry less than 10 pounds, stand or walk at least 2 hours and sit about 6 hours in an 8-hour work day, and limited pushing and pulling with upper extremities (R. 89-90), with further limitations for only occasional

---

[9] Those five criteria are:
   (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
   (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
   (3) the consistency of the opinion with the record as a whole;
   (4) specialty, with greater weight given to relevant specialists;
   (5) and other factors which tend to support or contradict the opinion.

climbing, balancing, stooping, kneeling, crouching, and crawling (R. 91) and frequent but not constant handling (gross manipulation) (R. 92), and limited concentrated exposure to hand vibration (R. 93). The main difference is that Dr. Digby felt that Plaintiff could sit for 6 hours while Dr. Omel felt that Plaintiff could only sit for 4 hours per day.[10]

The only contrary evidence in the record is arguably Plaintiff's testimony regarding his ability to lift or carry (R. 171).  In his disability application Plaintiff indicated that he could only lift 10 pounds (R. 73), and his wife indicated that he had a hard time lifting or picking things up (R. 76). When asked at the hearing how much he could lift Plaintiff responded "10 pounds maybe".  When asked how much he could carry Plaintiff responded that he did not "do much carrying".  When the question was repeated Plaintiff responded "well if I had to, I probably could pick up 20, just to pick it up, not to carry it any length or anything."  This is the only evidence in the record which arguably supports a conclusion that Plaintiff can lift 20 pounds, and it appears that ALJ Roshak based his decision largely upon it, because, after rejecting Dr. Omel's opinion, he determined that Plaintiff could perform light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 CFR § 404.1567.

### B.    State Agency Consultants

Plaintiff also argues that ALJ Roshak failed to properly consider the opinions of the state agency consultants, Drs. Digby, Domino and Cho.  "Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature

---

[10] This difference was likely not compelling to ALJ Roshak, as he failed to address Dr. Digby's opinion in his decision except to say that State Agency opinions in the record will be given weight dependent upon the "degree to which the medical or psychological consultant provides a supporting explanation..." (R. 19).

and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources at the administrative law judge and Appeals Council levels of administrative review.  Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions."  SSR 96-6p.

Regarding the determination of a claimant's RFC, "[a]lthough the administrative law judge and the Appeals Council are responsible for assessing an individual's RFC at their respective levels of administrative review, the administrative law judge or Appeals Council must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists.  At the administrative law judge and Appeals Council levels, RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s).  Again, they are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence." *Id.*

Under the heading "Severe Impairment" ALJ Roshak summarized Plaintiff's testimony and medical records, including Dr. Cho's opinion (R. 16).  He did not mention specifically the opinions of Drs. Domino or Digby anywhere in the opinion, but generally stated that Social Security Rulings mandate that he duly consider State agency consultants opinions and that they be evaluated and given "weight insofar as they are supported by the evidence of record.  Nevertheless, such source opinions are never entitled to controlling weight or special significance on issues that are reserved to the Commissioner, hence the Administrative Law Judge....  The weight that will be given to the opinion will depend on the degree to which the medical or psychological consultant provides a supporting

21

explanation for the opinion" (R. 19).  He added that

> the medical source opinions of state agency medical and psychological physicians and other medical opinions have been examined and accorded due consideration with respect to the evidence of record and given appropriate weight in determining Claimant's disability.  These opinions and findings may no longer apply as additional evidence has been received subsequent to such assessment or because of testimony received at the hearing which provided information not previously available.

 (R. 20)

This statement leaves the reader to determine whether the state agency consultants opinions were applied or not, what weight they were given and whether evidence in the record received after the consultants' opinion was sufficient to negate the consultants' opinions.

Because there is no indication that ALJ Roshak gave Dr. Omel's opinion and the consistent opinion of the state agency's Dr. Digby any consideration, as required by the Commissioner Rulings and regulations, this Court can have no confidence that Plaintiff's RFC was properly determined. Given the importance in this case to proper consideration of this evidence, it should be determined that the RFC findings of the ALJ are not supported by substantial evidence.

### i.    <u>Mental RFC Assessment</u>

On November 9, 2002, Dr. Cho diagnosed Plaintiff with dysthmic disorder and personality disorder, and gave Plaintiff a GAF of 55 (R. 146) indicating moderate difficulty in social or occupational functioning (*see* footnote 4).

Dr. Domino completed the *Psychiatric Review Technique Form* (PFTF) on December 4, 2002, indicating that Plaintiff had an Affective Disorder (dsythmic disrder) and Personality Disorder (R. 97). She described Plaintiff as having no restrictions in daily living, and moderate difficulties in maintaining social functioning, concentration, persistence or pace (R. 107).  Dr. Domino also

completed the *Mental Residual Functional Capacity Assessment* indicating that Plaintiff was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public and respond appropriately to changes in work setting (R. 111-112).  Plaintiff's resulting Functional Capacity Assessment was for unskilled simple work, 40 hours/week, without intense general public interaction, with changes in work done "in step by step fashion" (R. 113).

There are no medical records subsequent to these reports regarding Plaintiff's mental health status, except Dr. Omel's April 23, 2004, letter in which he reiterates his diagnosis of depression and anxiety (R. 155).

Plaintiff testified that he (a) was being treated for depression by Dr. Omel, and that he has been battling depression his entire life (R. 176-77); (b) did not have trouble understanding detailed instructions, but did have trouble remembering such, and also had trouble concentrating and maintaining attention (R. 172); and (c) had difficulty getting along with supervisors and, to a lessor extent, coworkers during his previous employment (R. 173).

While there appears to be no evidence in the record subsequent to these reports to dispute Drs. Cho and Domino's reported findings, ALJ Roshak did not include any non-exertional limitations in Plaintiff's RFC.  In his hypothetical to the VE asked her to give him information assuming that Plaintiff's allegations regarding non-exertional limitations were true (R. 184), but then chose to ignore the VE's resulting testimony as not based upon a credible limitations (R. 20).  Therefore, it seems clear that he did not give any weight to the expert opinions of Drs. Cho and Domino.  He does not explain why this uncontradicted data is not at least partially credited.  In the absence of a basis for discounting this limitation in concentration and attention, it must be factored into the hypothetical

23

question if the limitation is likely to affect the ability to perform the jobs identified by the VE.  Here such limitations likely would affect the ability to do sorting, visual inspection and assembly, particularly if quotas or production lines are involved.  VE Tripi noted they would (R. 185).  ALJ Roshak was not required to quote directly the findings from the PRTF into his RFC or the hypothetical question posed to the VE.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Yet a Plaintiff with a mental impairment is entitled to a hypothetical question which adequately describes that claimant's limitations arising from a mental impairment in some other way.

For these reasons it was error for ALJ Roshak to ignore the undisputed opinions of Drs. Cho and Domino regarding Plaintiff's moderate limitations, as described above.

## ii.    Physical RFC Assessment

As noted above, Dr. Digby on  November 9, 2002, assessed Plaintiff as having a RFC to occasionally lift/carry 10 pounds, frequently lift/carry less than 10 pounds, stand or walk at least 2 hours and sit about 6 hours in an 8-hour work day, and limited pushing and pulling with upper extremities (R. 89-90), with further limitations for only occasional climbing, balancing, stooping, kneeling, crouching, and crawling (R. 91) and frequent but not constant handling (gross manipulation) (R. 92), and limited concentrated exposure to hand vibration (R. 93).   The weight restrictions were consistent with Dr. Omel's April 2004 evaluation.

Subsequent to Dr. Digsby's RFC assessment, Plaintiff was seen for a reoccurrence of blood in his stool, which was managed with medication (R 147).  Plaintiff also had an MRI which revealed that he has a mild diffuse bulge of the L4-5 and L5-S1 discs (R. 148), and electromyographic testing on his extremities neck and back which revealed that he still had carpal tunnel syndrome but no neuropathy, radiculopathy, myopathy or plexopathy in the other nerves or muscles tested (R. 154).

And last, Dr. Omel issued a subsequent report which gave his most recent findings on Plaintiff's limitations, as previously described (R. 157).

Plaintiff's hearing testimony revealed that he felt that he could sit for 45 minutes to 1 hour, stand for 15 minutes and walk 150 feet (R. 170-71). He also felt that he could not climb stairs and had trouble bending, pushing, pulling, stooping, kneeling, climbing, crawling, crouching, squatting and reaching (R. 171-73). And, as discussed above, Plaintiff indicated that he could lift ten pounds and, if he "had to," 20 pounds if it did not require that he carry such (R. 171).

ALJ Roshak attributed Plaintiff with an RFC for unskilled, light work with a sit/stand option, and lifting/carrying no more than 20 pounds (R. 21). In addition to lifting up to 20 pounds, light work may involve a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 CFR § 404.1567. Therefore, it seems clear that ALJ Roshak did not give weight to Dr. Digby's opinion that Plaintiff was limited in his ability to push, pull, lift more than 10 pounds, etc. Nor did he credit a similar opinion of Plaintiff's treating physician, Dr. Omel. While often a state consulting physician can be ignored, that is not the case when the opinion supports the opinion of a treating source on a critical exertional capacity. Plaintiff's testimony regarding his ability to lift 20 pounds if he "had to", is very thin evidence for ALJ Roshak to use to make a finding plaintiff is capable of more than sedentary work.

As noted above, the failure to give proper consideration to the treating source and the state agency evaluator, coupled with the failure to give adequate justifications for discounting their opinions, erode the substantial evidence needed for ALJ Roshak's RFC finding.

### 3.  Plaintiff's Credibility

Plaintiff argues that ALJ Roshak erred in questioning his credibility. ALJ Roshak determined

that Plaintiff "has an underlying medically determinable impairment that could reasonably cause the pain (or other symptoms) alleged, but Claimant's subjective allegations of pain, numbness, weakness and depression of such frequency, intensity, or duration as to preclude the performance of any substantial gainful activity are not supported by objective clinical, laboratory, or x-ray findings or by any non-medical evidence, thus not fully credible.  Nor is there any objective support for the functional limitations, impairments of concentration, attentiveness, and memory, or medication-induced headaches to which Claimant testified" (R. 17).

The standard for an administrative law judge's credibility finding is as follows:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

S.S.R. 96-7p.

Because an ALJ had the advantage of evaluating a claimant's demeanor during the in-person testimony, Courts are limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were reasonable and supported by substantial evidence in the record.  *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain. *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986). While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence. Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective

medical evidence to fully corroborate the alleged severity of pain.  Section 404.1529(c)(2),[11]  *see also*

*Duncan,* 801 F.2d at 853. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,*

947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985);

*Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

*Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994), made it clear that  "[t]here is no practical

difference between requiring a claimant to prove pain through objective evidence and rejecting her

subjective evidence because it is not corroborated by objective evidence."  Nor can an ALJ  merely

recount the medical evidence and claimant's daily activities and then without analysis summarily

conclude:

> Based upon an overall evaluation of the relevant written evidence of
> record as summarized above, the undersigned finds it does not contain
> the requisite clinical, diagnostic or laboratory findings to substantiate
> or form the underlying basis for claimant's testimony regarding totally
> disabling pain and other disabling impairments. . . .

*Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).

*Jones v. Commissioner,* 336 F.3d 469, 476 (6th Cir. 2003), notes that an ALJ can reject a

claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question

to the VE, if the ALJ's reasons are adequately explained.

The Commissioner's regulations  20 C.F.R. § 404.1529(c)(3) clearly state that in addition to

---

[11]  29 C.F.R. § 404.1529(c)(2) states:
> We will not reject your statements about the intensity and
> persistence of your pain or other symptoms or about the effect
> your symptoms have on your ability to work solely because the
> available objective medical evidence does not substantiate your
> statements.

evaluating the objective evidence, the ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain.

ALJ Roshak held that Plaintiff's daily activities of "fixing meals, picking up around the house, washing dishes, doing laundry, vacuuming, reading, surfing the Internet, playing computer games, walking the dog, shopping for groceries, driving, visiting out and going [to] football games ... comport with the residual functional capacity for light work with a sit/stand option and show forth an ability to concentrate, maintain attention, and sustain activity sufficient for the performance of unskilled work, despite depression and anxiety" (R. 18).

With regard to Plaintiff's back pain complaints ALJ Roshak points out that "despite Claimant's subjective allegations [of] debilitating pain, numbness, and weakness, he remains neurologically intact without any objectively measured focal sensory, motor, or reflex deficit, ambulates unaided with a normal gait, is able to heel, toe and tandem walk and fails to exhibit weight loss, muscle atrophy, or any other indicia of longstanding, disabling pain" (R. 17). Further, he points out that Plaintiff's colitis and hypertension are controlled with medication.

With regard to Plaintiff's obesity he notes that there was no allegation or record that Plaintiff's obesity was at a level that would limit him mechanically, nor any evidence that Plaintiff is unable to lose weight.[12] ALJ Roshak also found the largely negative February 2004 electromyographical studies and the MRI of the lumbar spine which showed "only mild disc bulging L4-5 and L5-S1 with

---

[12]As explained above, an ALJ is entitled to consider a claimant's refusal to lose weight despite the aggravation obesity causes their condition when considering whether a claimant's pain allegations are credible. *Walton,* 875 F.2d at 869.

no evidence of disc herniation or spinal stenosis to be instructive.

Yet, Plaintiff described his inability to sleep through the night due to pain and colitis symptoms, which his wife confirmed (R. 77). And while ALJ Roshak states that Plaintiff fixes meals, Plaintiff actually only stated that he fixes himself breakfast and lunch, his wife has to do "all the hard cooking" (R. 67). The finding that Plaintiff can wash dishes, do laundry and vacuum appears to be based upon one *Daily Activity Sheet* which indicates that Plaintiff performed these activities in the morning and went to bed at 1:00 in the afternoon with a migraine, woke to eat dinner at 3:00 p.m. and "sat around the rest of the day" (R. 86).[13] The rest of the evidence in the record regarding Plaintiff's ability to assist in household chores indicates that he does so only rarely and only when his conditions allow. For instance, Plaintiff indicated that he does light things to help out once a week for 10-15 minutes at a time with assistance (R. 68, 169). His wife stated that he needs assistance with household chores including laundry and cooking (R. 78). She also confirmed that the "minor tasks" he does around the house are only done "when he's not in pain," and that he has a hard time bending, lifting or picking things up (R. 74, 76). Plaintiff stated that he does grocery shopping for 20 minutes at a time before his leg starts to go numb (R. 68, 168-69).

Regarding what ALJ Roshak termed visiting out, Plaintiff stated that he visited his mother for 30 minutes at a time once a week (R. 69-70) and his wife confirmed that he only visits relatives when he has to (R. 77) and that his friends and family have become accustomed to his explosive moods and sullen personality (R. 75).

Plaintiff stated that he could walk 1-2 blocks before stopping due to pain for 5-10 minutes (R.

---

[13]The only other two *Daily Activity Sheets* in the record show no activity due to colitis (R. 87) or arthritis pain (R. 88).

72).  Plaintiff also indicated that he must rest after he does anything (R. 73).  While ALJ Roshak indicated that Plaintiff could drive, Plaintiff's wife indicated that he does so only when really needs to because of eye problems associated with Graves disease (R. 76), and Plaintiff indicated that he could not ride in a car for long trips (R. 174).  ALJ Roshak also indicated Plaintiff could attend football games, but the only evidence of this was Plaintiff's wife's statement, in which she indicated that he attends football games but comes home early because he cannot stand long or sit in the bleachers (R. 77).  His wife noted that he had stopped participating in all sports and reduced his attendance at high school football games due to his limited ability to stand and sit (R. 74).

These factors, as well as whether Plaintiff's obesity combined with his other impairments may have increased the effects of his limitations, should have been considered in the context of determining whether Plaintiff's subjective pain complaints were credible.

Plaintiff had the burden of providing objective evidence confirming the severity of the alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain.  *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  *See also  McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); *see also* 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, as ALJ Roshak admits, Plaintiff has the objective and clinical diagnostic evidence of an

31

underlying medically impairment that could reasonably cause the pain alleged (R. 17). As in most cases, there is no objective evidence of the pain itself. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." His subjective evidence, and treatment history, and the fact that state agency consultants agree with his treating physician's diagnosis is central to this analysis. Also significant is ALJ Roshak's apparent failure to consider the subjective evidence other than when it was helpful to a non-disabled determination. He repeatedly refers to the lack of objective evidence (R.17-18). Therefore, even though the evidence is not unequivocal, it cannot be said that ALJ Roshak had substantial evidence in the record to support his finding that Plaintiff's subjective pain complaints were not credible - a credibility assessment consistent with SSR 96-7p should have been done.

In sum, on the present record, with the inadequate credibility findings and improper use and/or evaluation of both the treating physician' and state agency consultants' RFC and mental health opinions, there is not substantial evidence to uphold the Commissioner's finding. Thus the decision of the Commissioner should not be upheld.

The remaining question is whether to remand for further proceedings or for an award of benefits. *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). On the present record, it cannot be said that Plaintiff meets these requirements for an award of

benefits.  Thus, this matter should be remanded for further proceedings, including a credibility assessment consistent with SSR 96-7p and the case law of this Circuit, and a further residual functional capacity evaluation taking into account Drs. Cho and Domino's expert opinions regarding Plaintiff's moderate limitations in social and occupational functioning and giving the opinions of Dr. Omel and Dr. Digby proper consideration.

## III.    RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6thCir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

33

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: November 29, 2005                              s/Steven D. Pepe
Ann Arbor, Michigan                                   United States Magistrate Judge


.


<u>Certificate of Service</u>

I hereby certify that copies of the above were served upon the attorneys of record by electronic means or U. S. Mail on November 29, 2005.

                                        s/William J. Barkholz
                                        Courtroom Deputy Clerk


34